STRYKER CORPORATION, A MICHIGAN CORPORATION, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Stryker Corp. v. Commissioner
Docket No. 11908-78.
United States Tax Court
T.C. Memo 1982-504; 1982 Tax Ct. Memo LEXIS 243; 44 T.C.M. (CCH) 1020; T.C.M. (RIA) 82504; September 1, 1982. *243 E. James Gamble and Louis W. Kasischke, for the petitioner. Richard A. Witkowski, for the respondent. SCOTT MEMORANDUM FINDINGS OF FACT AND OPINION SCOTT, Judge: Respondent determined a deficiency in petitioner's income tax for the taxable year 1973 in the amount of $159,005.58. The sole issue for decision is whether petitioner may allocate a portion of the purchase price, which its purchase contract designates it paid for stock, to a covenant-not-to-compete. FINDINGS OF FACT Petitioner Stryker Corporation is a corporation duly incorporated under the laws of the State of Michigan. At the time of the filing of its petition herein, petitioner maintained its principal office in Kalamazoo, Michigan. Stryker Corporation filed its income tax return for the taxable year 1973 on September 18, 1974, with the Internal Revenue Service Center, Cincinnati, Ohio. Stryker Corporation (Stryker) is a corporation engaged in the manufacture and sale of medical and surgical supplies and equipment. Stryker markets its medical supplies and equipment on a national basis and its name is well known in the medical field. Prior to 1968, Stryker developed *244 and patented a gelatinous substance which it used in the manufacture of a device used to provide relief to bedridden patients. This device, which was also patented, is known as the Stryker Flotation Cushion. The flotation cushion, when used by bedridden patients, prevents the formation of bedsores. The cushion is 16 inches by 16 inches by 2 inches in size and weighs approximately 16 pounds. The flotation cushion, or pad, consisted of the gel surrounded by a rubber covering. Additionally, Stryker manufactured cloth covers to be placed over the pad. The pads could be sterilized and were reusable. Depending on their treatment in use, the pads might last anywhere from one month to three years. When Stryker first began planning its marketing strategy for its flotation cushions, it considered the alternatives of either leasing the cushions or making outright sales. Stryker decided to confine itself to making outright sales rather than leasing the cushions and followed this procedure until 1972. It initially marketed the cushion in the same manner as its other medical supplies and equipment. Stryker maintains a national sales force through which it markets its medical supplies *245 and equipment. This sales force is structured geographically, with individual salesmen responsible for certain accounts in a particular geographic area under the direction of territorial managers. The territorial managers were under the direction of district managers. Although Stryker had initially decided not to enter into the leasing of the flotation cushions, certain of its sales personnel, perceiving the wide acceptance of the cushions, with the consent of Stryker, established leasing service businesses for their own individual accounts within their sales regions. In 1968, an individual named Maurice Knox was employed by Stryker as its district manager in charge of sales for an area which included all or a portion of the States of Kentucky, Tennessee, West Virginia, Illinois, and Indiana. Stryker, in this sales district, had over 350 accounts with different hospitals. Mr. Knox's duties as district manager included the direct supervision of two territorial managers as well as personal responsibility for many of the hospital accounts in the district. The profitability of petitioner's business depends heavily upon the effectiveness of the individuals in its sales force. *246 Mr. Knox, due to his personality and sales ability, was an extremely productive and valuable employee of Stryker. In 1968, while still in the employ of Stryker, Mr. Knox, for his own account, began to lease the Stryker Flotation Cushions to hospitals and nursing homes which he serviced as a representative of petitioner. Mr. Knox purchased the cushions from Stryker to lease to the hospitals and nursing homes. His usual lease arrangement was to charge his customers $2.50 per cushion for each day of actual use. Mr. Knox recommended that the hospitals and nursing homes in turn charge their patients $5.00 per cushion for each day of use. The cushions were stored on the premises of the hospitals and nursing homes to which they were leased. The hospitals and nursing homes also reported the amount of actual use made of the cushions to Mr. Knox and remitted to him his share of the rentals. Mr. Knox initially engaged in the leasing of the cushions as a sole proprietor under the name Knox Rental Service. However, on July 1, 1971, he incorporated and formed Knox Rental Service, Inc. (Knox Rental), to carry on the leasing business. Knox Rental was essentially a one-man corporation, *247 with the only employees being Mr. Knox and his wife. Throughout the time in which Mr. Knox conducted his leasing business, he remained employed by Stryker as a district manager. In 1972, Stryker decided to enter the business of leasing cushions for its own account. Through the conduct of his cushion-leasing business, Mr. Knox had gained considerable expertise in the field of cushion leasing. To obtain the benefit of that expertise for Stryker's own nationwide leasing operation, on January 21, 1972, petitioner entered into an agreement with Knox Rental whereby Knox Rental would provide certain management services in developing petitioner's leasing business throughout the United States. However, the agreement expressly provided that such management services would not be provided in Knox Rental's primary States of Tennessee, Kentucky, and West Virginia. This entry of Stryker into the leasing business would place it in competition with some of its other salesmen who were already operating leasing businesses for their own accounts. On December 19, 1972, Stryker entered into an agreement for the purchase of the stock of DMR, Inc. (DMR), a Colorado corporation engaged in the business *248 of leasing Stryker Flotation Cushions. The agreement for the purchase of the stock provided for a price of $90,000 for the stock. The principals of DMR were two individuals names Joe F. Reale and Roy F. Dunphy, who owned all of the stock of the corporation. In addition to the stock purchase agreement, a covenant-not-to-compete was entered into by Mr. Reale and Mr. Dunphy with Stryker which provided in pertinent part: WHEREAS the parties have entered into an Agreement for the sale and purchase of all of the stock of D.M.R., Inc., a Colorado Corporation ("D.M.R.") by Agreement executed simultaneously with this Agreement; and WHEREAS Sellers have developed the business of D.M.R. and have gained contacts and expertise of such nature that the use thereof in competition with D.M.R. would deprive Stryker of the benefits of the ownership of the stock of D.M.R.; and WHEREAS Stryker would not purchase the stock of Sellers except it receive Sellers' agreement not to compete for a reasonable period of time; NOW, THEREFORE, IT IS AGREED AS FOLLOWS: 1) In consideration of the promise of Stryker to pay the sum hereinafter set forth, Sellers jointly and severally agree that neither of them *249 will, until December 15, 1978, engage in or have any interest in any business in the State of Colorado in competition with D.M.R. For the purposes of this Agreement it is understood that it is intended in its broadest form and that, without narrowing the generality of the foregoing, neither Seller will engage in or have any interest in a similar business as employee, partner, consultant, representative, sole proprietor or stockholder. 2) In consideration of the promises of the Sellers, Stryker agrees to pay the Sellers the sum of $30,000.00 payable in the following manner, without interest: July 15, 1974
$6,000.00
July 15, 1975
6,000.00
July 15, 1976
6,000.00
July 15, 1977
6,000.00
July 15, 1978
6,000.00
Simultaneously with Stryker's purchase of the stock of DMR, DMR and Mr. Dunphy entered into an employment agreement under which DMR agreed to employ Mr. Dunphy as manager of its business for a period of three years. As of February 1, 1973, Mr. Knox was appointed to the position of national pad rental manager of Stryker's cushionleasing operation, while still retaining his position as a district sales manager. Stryker and Mr. Knox agreed that Mr. Knox *250 would be paid as national pad rental manager a salary of $20,000 per year and as district manager a salary of $10,000 per year. [1] *251 The parties further agreed that Mr. Knox would fully participate in the Stryker Corporation profit-sharing plan. The previous agreement between Stryker and Knox Rental, under which Mr. Knox's services had been furnished to petitioner, was terminated as of the same February 1, 1973, date. Mr. Knox continued to carry on his leasing business through Knox Rental. As early as January 1972, Mr. Knox offered to sell his business to Stryker for an amount in excess of $400,000. Stryker turned down that offer and subsequently Mr. Knox indicated that he was willing to accept a lower price for his business. In 1973, Stryker began negotiations with Mr. Knox. Representing Stryker in the negotiations were Lee Stryker, its president, and John K. Fell, its secretary and treasurer. Lee Stryker had the final say on whether a deal would be concluded by Stryker. However, Mr. Stryker delegated much of the negotiations concerning the specific details of the transaction to Mr. Fell. As a part of these negotiations, Stryker engaged the accounting firm of Ernst & Ernst to do a study of Knox Rental. The Nashville, Tennessee, office of Ernst & Ernst did a study of Knox Rental and submitted a special report, dated July 20, 1973, on Knox Rental as of May 31, 1973, to Stryker. Ernst & Ernst had been directed to do the following in its study of Knox Rental: (1) examine Knox Rental's cash receipts on a test basis for the 11-month period ending May 31, 1973; *252 (2) request direct confirmation of the number of Stryker flotation pads used by hospitals serviced by Knox Rental, which were owned either by Knox Rental or by Mr. Knox personally; (3) request direct confirmation of amounts owed Knox Rental by those hospitals renting pads from it as of May 31, 1973; (4) request direct confirmation of amounts owed to certain banks by Knox Rental as of May 31, 1973; and (5) assist in the preparation of a projected statement of cash flow assuming the purchase of Knox Rental's common stock and the flotation pads owned by Mr. Knox personally. The July 20, 1973, special report from the Nashville office of Ernst & Ernst discussed the accounting firm's findings as to these matters. The report also contained the following statement: 6. We understand the Kalamazoo office of Ernst & Ernst will comment on the various tax consequences involved in purchasing the assets of Knox Rental Service, Inc. and Mr. Knox vs. purchase of the common stock of Knox Rental Service, Inc. and the flotation pads owned by Mr. Knox personally. On August 3, 1973, Stryker and Mr. Knox entered into an agreement for the purchase of the stock of Knox Rental by Stryker. This agreement *253 provided in pertinent part as follows: ARTICLE III. PURCHASE AND SALE OF SHARES: ESCROW
Based on the representations, warranties and agreements of Stryker and Seller and subject to the terms and conditions herein stated: A. Seller herewith delivers to Escrow in street form all of the shares of stock of the Company executed in street form. B. In exchange for all of the outstanding stock of the Company, Stryker, subject to the terms, of this agreement, agrees to buy said stock for the total price of $330,491.00, payable $4,000 principal and $2,002 interest accrued July 1 to August 1 forthwith. The Balance shall be paid according to a promissory note annexed hereto as Exhibit B. ARTICLE VI. CONDITIONS OF CLOSING - STRYKER
The obligation of Stryker to acquire stock subject to this agreement is subject to satisfaction, on or prior to Closing Date, of the following conditions: C. Upon consummation of the transaction contemplated Stryker will acquire all rights, title, and interest in and to all of the shares of the Company issued and outstanding, free and clear of all liens and encumbrances and adverse claims of every nature and description and Stryker will *254 have good and marketable title to the same. H. Stryker shall have received at the Closing "no competition" agreements from Seller in substantially the form annexed hereto. The agreement did not allocate any part of the stated $330,491 purchase price to the covenant-not-to-compete to be received. Subsequently, Mr. Knox and Stryker executed the following agreement: WHEREAS the parties have entered into an Agreement for the sale and purchase of all of the stock of KNOX RENTAL * * *, A Tennessee Corporation, ("COMPANY") and WHEREAS in addition the buyer wishes to restrict the seller from competing with Knox Rental * * *, and NOW, THEREFORE, in consideration of $1,000.00 paid by the buyer, the receipt of which is hereby acknowledged, Maurice Knox agrees that he will not, until August 15, 1979, engage in or have any business in the States of Tennessee, Kentucky, and West Virginia [and] in the following counties in the States of Indiana and Illinois: Indiana: Clark County, Floyd County, Harrison County, Jefferson County, Ohio County, Scott County, Switzerland County. Illinois: Alexander County, Hardin County, Johnson County, Nassac County, Poke County, Pulaski County *255 and Union County. in competition with any business in which the Company was engaged on 1 July 1973. * * * The August 10, 1973, minutes of a meeting of the board of directors of Stryker state the following: A meeting of the Board of Directors of STRYKER * * * was held at 420 Alcott Street, Kalamazoo, Michigan, August 10, 1973 at 2:00 P.M. pursuant to Waiver of Notice signed by all Directors. PRESENT: L. Lee Stryker Homer H. Stryker John K. Fell The President stated that he had been negotiating with the owner of all of the stock of Knox Rental * * *, a Tennessee corporation leasing Stryker products. After discussion it was moved, supported, and unanimously carried that the Corporation purchase all of the outstanding stock of Knox Rental * * *, for an amount not to exceed $385,000 and that the Secretary-Treasurer be authorized to execute all documents on behalf of the Corporation to accomplish the same. By a letter dated August 23, 1973, counsel for Stryker informed Mr. Knox that Stryker had taken all action necessary in order to carry out the terms of the agreement for the purchase and sale of the stock of Knox Rental. The letter also enclosed a copy of the minutes *256 of the August 10, 1973, board of directors' meeting. Both the August 3, 1973, stock purchase agreement and the no-competition agreement were drafted by the attorney for Mr. Knox. Prior to Stryker's signing the agreements, Stryker's counsel was given copies of the agreements to review. After the execution of the stock purchase agreement, Mr. Knox continued to be employed by Stryker as its national pad service manager. In this function, Mr. Knox was responsible for the nationwide hospital cushion-leasing program conducted by Stryker. His responsibilities included overall supervision of the program, as well as day-to-day administration and training of Stryker's personnel. In January 1974, Mr. Knox became Stryker's southern division manager, responsible for all of Stryker's marketing activities in a seven-State area. In October 1974, Mr. Knox returned to his position as national pad service manager, where he remained until his death in January 1976. Stryker maintained and operated Knox Rental as a subsidiary until January 1, 1977, when it was merged into Stryker. At the time Stryker entered into the agreement with Mr. Knox, the balance sheet of Knox Rental showed assets *257 with book value (net of depreciation) of $75,569.11, liabilities of $76,354.17, and a deficit in stockholder's equity of $785.06. Its assets included Stryker Flotation Cushions with a book value (net of depreciation) of $48,862.60 and cash and rents receivable totaling $24,806.51. Its liabilities, which were assumed by Stryker, included $57,025.74 due to banks and $18,000 due to a pension plan established by Knox Rental. Knox Rental filed its income tax returns for a fiscal year ended June 30. Its income tax returns for the fiscal years ended June 30, 1972, June 30, 1973, and June 30, 1974, show the following: Item
FYE 6/30/72
FYE 6/30/73
FYE 6/30/74 *
Gross receipts
$106,521.29
$149,691.54
Cost of sales
6,536.40
4,168.25
Gross profit
$ 99,984.89
$145,523.29
Gross rents
$176,694.48
Compensation of officers
$ 37,200.00
$ 40,660.00
Rents
26,463.32
5,500.00
Taxes
1,049.48
1,197.75
4,000.00
Interest
1,206.81
5,754.40
68.29
Contributions
17.50
Depreciation
12,618.60
43,195.66
35,809.26
Advertising
22.50
Profit sharing
18,000.00
18,000.00
Other Deductions
10,662.40
31,502.20
65,297.51
Total Deductions
$107,218.11
$145,832.51
$105,175.06
*258 Item
FYE 6/30/72
FYE 6/30/73
FYE 6/30/74 *
Taxable Income
before net operating
loss deduction
$ (7,233.22)
$ (309.22)
$71,519.42 Net operating loss
deduction
(7,233.22)
(7,542.44)
Taxable Income
$ (7,542.44)
$63,976.98 Tax
$29,042.29 On Stryker's income tax return for 1973, the following item was listed in Schedule M-1--Reconciliation of Income Per Books with Income Per Return: LINE 8 - DEDUCTIONS IN THIS TAX RETURN NOT CHARGED AGAINST BOOK INCOME THIS YEAR
Cost of non-competition expenditure not currently
amortized on books
$330,331.06
On the individual income tax return filed by Mr. Knox for 1973, he reported the sale of his stock on Knox Rental at a gross sales price of $330,062.55 and elected the installment sale method of reporting the gain on such transaction. All of the gain was reported by the return as being long-term capital gain. On August 27, 1979, Stryker filed a claim for refund for 1975 with the Internal Revenue Service. The claim for refund stated the following: *259 As a result of examination of the taxpayer's income tax return for the calendar year 1973, the Internal Revenue Service tentatively determined a deficiency for calendar 1973 and an overassessment for calendar 1974 resulting from adjustments made in 1973. Taxpayer has not agreed to the adjustments made by the Internal Revenue Service for 1973 or the tentative overassessment for 1974. Accordingly, the taxpayer claims a refund in the amount of $26,506.48 for 1975. This refund is based on the amortization of an amount claimed to be paid for a covenant not to compete computed as follows: Amount paid for covenant not to compete
$331,331.06
Period of amortization
72 months
Amortization allowable: 1973
$ 27,610.92
1974
55,221.84
1975
55,221.84
1976
55,221.84
1977
55,221.84
1978
55,221.84
1979
27,610.94
$331,331.06
Additional deduction claimed on
Part I, Line 2
$ 55,221.84
In his statutory notice to Stryker, respondent determined a $159,005.58 deficiency in income tax for the taxable year 1973. The statutory notice contained the following explanatory statements: (g)--It is determined that the expenditure under an agreement executed *260 on August 3, 1973, between Stryker Corporation and Maurice Knox was a capital expenditure for the acquisition of all of the outstanding stock of Knox Rental Services, Inc., a going leasing concern. The claimed deduction for non-competition expense is, therefore, not allowed. Computation of the disallowance-- Stock purchase price per agreement
$330,491.00 Covenant not to compete--as allocated
per contract
1,000.00 Total
$331,491.00 Miscellaneous net adjustments by taxpayer
(159.94)
Deduction claimed--not allowed
$331,331.06 (h)--The sum allocated to the covenant by contract, $1,000, is amortizable over 72 months. The amount of $69.45 is allowed in the taxable year ended December 31, 1973. On brief, petitioner conceded that Stryker is not entitled to an allowance for amortization for the covenant-not-to-compete with respect to $120,000 of the total purchase price of the Knox Rental stock. This $120,000 amount represents the value at which petitioner's expert appraised the shares of Knox Rental and petitioner on brief acknowledges that such amount was paid for the stock of Knox Rental. OPINION It is petitioner's position that although the *261 contract entered into between Stryker and Mr. Knox provided for a payment of $330,491 for the stock of Knox Rental and $1,000 for Mr. Knox's covenant-not-to-compete, in economic reality most of the $330,491 stated to be paid for the stock should be allocated either to a payment for Mr. Knox's services or a payment for his covenant-not-to-compete. Different courts have adopted varying approaches to the determination of this issue. See . This Court has favored a rule which places heavy emphasis upon the intention of the parties at the time the contract was entered into and has held that "strong proof" is required for a taxpayer to show an allocation other than that contained in the contract. ; Another factor of considerable importance is whether the covenant has independent economic significance (economic reality) separable from the goodwill that is inherent in the stock purchase. The economic reality *262 test, however, is applied with a view to the parties' intentions, i.e., whether the covenant was separately bargained for and, if so, whether it had a value in excess of that allocated to it in the contract. . In , affg. a Memorandum Opinion of this Court, the Sixth Circuit adopted the "strong-proof" rule of this Court stating "Where, after arms-length bargaining, the parties have established the separate value of a covenant not to compete, strong proofs are required to overcome the effects of their allocation." The contract which petitioner entered into clearly provides that $330,491 is allocated to the stock purchase and $1,000 to the seller's covenant-not-to-compete. [2] Petitioner, while apparently recognizing the "strong-proof" requirement, attempts to dispense with making a showing that an allocation, other than that contained in the contract, was intended by both parties to the contract. *263 Petitioner has totally failed to show that the parties intended its contended-for allocation. In fact the record clearly indicates that the allocation made in the contract was the allocation intended by the parties. At trial, petitioner offered the testimony of Mr. Fell, one of the two officers of Stryker who had participated in the negotiations to acquire Knox Rental. [3] Mr. Fell testified that in actuality Stryker was acquiring the services of Mr. Knox by the purchase of the stock of Knox Rental. Mr. Fell stated that he had no discussions with Mr. Knox concerning the allocations to the stock price and the covenant and no discussions concerning tax consequences of the agreement. Mr. Fell's testimony in effect was that even though Mr. Knox was an employee of Stryker doing a creditable job, he felt that Mr. Knox would do a better job if he was not also managing Knox Rentals. Mr. Fell attempted to explain away the specific allocation in the contract by claiming that the parties had no intent to make such an allocation. *264 However, the fact that the contract makes a specific allocation of $1,000 to the covenant-not-to-compete and $330,491 to the price of the stock is strong evidence that the parties intended such an allocation.Additionally, there is other evidence in the record which strongly indicates that Stryker was aware of the tax consequences of such an allocation. A special report prepared for Stryker by the Nashville office of Ernst & Ernst states that the Kalamazoo office of Ernst & Ernst would comment on the tax consequences flowing from structuring the transaction as a purchase of stock versus structuring the transaction as a purchase of assets. It seems highly likely to us that Ernst & Ernst would have further advised Stryker of the tax consequences of a specific allocation by the contract to the covenant-not-to-compete. Moreover, petitioner has at most offered evidence concerning only Mr. Fell's intention at the time the transaction was entered into. Petitioner has failed to offer any proof that the seller, Mr. Knox, did not intend to have the specific allocation of $1,000 made to the covenant-not-to-compete. In fact, the record strongly indicates to the contrary. The contract was *265 drafted by Mr. Knox's attorney. Although Mr. Knox was not alive at the time of the trial of this case, petitioner failed to call Mr. Knox's attorney as a witness in order to obtain his testimony. Mr. Fell, in his testimony, acknowledged that Stryker's own attorney had gone over the contract drafted by Mr. Knox's attorney but claimed that Stryker's attorney had not reviewed the contract for tax consequences but only to check the form of the agreement. However, petitioner did not call the attorney who had gone over the contract for Stryker as a witness. Petitioner's failure to call Mr. Knox's attorney or its own attorney leads us to believe that had the attorneys testified, their testimony would have been unfavorable to petitioner's case. [4] Based on the evidence of record, we find that the parties did intend to make an allocation of only $1,000 to the covenant-not-to-compete.
Petitioner further contends that the allocation made by the contract is substanceless; that in spite of the fact that the parties intended such an allocation, it should be allowed *266 to allocate a greater amount of the overall purchase price to the covenant. In support of this contention, petitioner offered the expert testimony of a witness who appraised the stock of Knox Rental at a value of $120,000. Petitioner argues that it should be allowed to allocate the remaining balance of the purchase price in excess of this $120,000 to the covenant-not-to-compete. In our view, the allocation contained in the contract is neither substanceless nor does it fly in the face of economic reality. We discount heavily the testimony of petitioner's expert witness that the stock of Knox Rental had a value of $120,000. This witness on examination acknowledged that a buyer who was interested in entering the leasing business on a national scale and who had special need for a corporation engaged in the leasing business might pay a premium for the business of such a corporation. Further, the appraisal made by the witness was made seven years after the fact solely for the purpose of this instant litigation. See . Moreover, since we have found that the allocation to the covenant was specifically bargained for in *267 arm's length negotiations, we would be extremely hesitant to substitute our judgment as to the value of the stock for that of the parties. [5]
The record clearly shows that the allocation contained in the contract comports with economic reality. Mr. knox was an employee of Stryker at the time of the purchase of the stock. Mr. Fell's own testimony was that he was performing the same functions before and after the purchase by Stryker of the stock of Knox Rental except perhaps that he travelled more after the purchase. The inference from the record is that Mr. Knox had no intention to compete with his employer, Stryker, after selling his stock in Knox Rental to Stryker. Knox Rental had a good rental business. In fact for about four years after the purchase, Stryker continued to operate the business under the name of Knox Rental. Clearly, there was value to the Knox Rental stock. The value negotiated by the parties was $330,491. The clear indication from the record is that this amount was a negotiated figure and that both prties understood that the price of the stock was $330,491. *268 Each party had a lawyer. The agreement was drafted by Mr. Knox's lawyer but was reviewed by Stryker's lawyer. Also, the record indicates that the tax effects of the transaction were explained to Stryker by its accountant, a national CPA firm. We find that petitioner is not entitled to an allocation of the purchase price to the covenant-not-to-compete in excess of the $1,000 allocation in the contract. Decision will be entered for the respondent.
Footnotes
1. On July 5, 1972, Stryker had entered into a new agreement with Maurice Knox relative to his employment as district sales manager. This agreement provided as "the entire compensation for his services" the district sales manager was to receive commissions on the net amount of sales in his territory. This agreement contained, among others, the following provision: Refer to Appendix A.
* 8. TRADE SECRETS AND RESTRICTIVE COVENANT As part of the consideration moving to STRYKER for the execution of this agreement, MANAGER agrees that during the term of this contract and any renewal thereof and throughout any time thereafter, he will not divulge to any other person, firm or corporation, the names of STRYKER'S customers or any other trade secrets which STRYKER may impart to him, and further agrees that upon termination of this agreement, he will deliver to STRYKER all lists of customers, samples, price lists and all other property belonging to STRYKER or relating to the business of STRYKER. MANAGER further agrees that for a period of one year after the termination of this agreement, whether with or without cause, he will not, for himself or on behalf of anyone engaged in a similar line of business, directly or indirectly, solicit business from any customer of STRYKER located in the TERRITORY covered by this agreement and any amendments thereto, and during such one year period MANAGER will not become interested in or associated directly or indirectly, as principal, agent or employee, with any person, firm or corporation which may solicit business from such customers. Appendix A provided as follows: Nothing in paragraph 8 of this contract shall effect the relationship of Maurice Knox to Knox Rental Service, Inc. now or in the future. Maurice Knox shall have the right to retain a list of all customers of Knox Rental Service, Inc. even though they may also be customers of Stryker Corporation. Active management of Knox Rental Service, Inc. by Maurice Knox shall not be construed to be a breach of the restrictive covenant contained in paragraph 8.↩
*. Filed during petitioner's period of stock ownership↩
*. Filed during petitioner's period of stock ownership↩
2. Although the parties executed two separate documents to embody their stock purchase agreement and no-competition agreement, the two agreements formed for all practical purposes a single contract and will be so treated.↩
3. At the time of the trial, Lee Stryker, the other officer who participated in the negotiations, was deceased. Therefore, the record is barren of any discussions he may have had with Mr. Knox out of the presence of Mr. Fell.↩
4. See , affd. .↩
5. See .↩